## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DALE ROBERT WHITE**, *et. al.* | * | **CIVIL ACTION NO.** |
| | * | **2:11-cv-02186-SSV-JCW** |
| **Plaintiffs,** | * | *consolidated with* **12-cv-0359** |
| **vs.** | * | |
| | * | **SECTION: E(2)** |
| **INTEGRATED ELECTRONIC** | * | |
| **TECHNOLOGIES,** *et al.* | * | **DISTRICT JUDGE MORGAN** |
| | * | **MAGISTRATE JUDGE WILKINSON** |
| **Defendants.** | * | |
| * * * * * * * * * * * * * * * * * * * * * | * | **JURY TRIAL DEMANDED** |

### DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF A COLLECTIVE ACTION

DISH Network, Inc. ("DISH") and Integrated Electronic Technologies, Inc. ("IET") (collectively, the "Defendants") submit this Supplemental Opposition to the Plaintiffs' Motion for Conditional Certification of Collective Action.

### INTRODUCTION

Plaintiffs filed their Motion for Conditional Certification on June 6, 2012. (Doc. No. 48) The Motion relies extensively upon the declarations of Ban Murray, Dale White, and Steven Baker. (Motion pp. 11-13)  Plaintiffs also filed a prior motion to conditionally certify in Case 1:11-cv-00583, with declarations from Tom Gibson, Joseph Everett, Kenneth Stevens[1] and Steven Baker.  (Doc. No. 11-1)  Defendants submitted an Opposition memorandum on July 13, 2012 and this Court held an oral hearing on August 15, 2012.

Defendants took depositions of most of the named Plaintiffs the weeks of August 6th and August 13th, and specifically the depositions of Baker on August 6th, Gibson on August 7th, Everett on August 9th, White on August 16th, and Murray on August 17th.  Defendants rushed

---

[1]      Defendants have not been provided with any date for the taking of Stevens' deposition.

the transcripts of these depositions but they were not available prior to Defendants' opposition deadline.[2]

Defendants submit this supplemental opposition for the limited purpose to point out that the very allegations that Plaintiffs rely upon in support of their <u>Motion</u> are directly contradicted and disavowed by Plaintiffs, themselves, throughout their deposition. Such contradictions certainly should be considered in determining whether conditional certification is appropriate. Accordingly, Defendants submit this brief supplemental memorandum identifying the contradictions in Plaintiffs' declarations and deposition testimony and Defendants request the Court disregard the declarations of Gibson, Everett, Murray, White, and Baker in their entirety.

<u>Analysis</u>

Plaintiffs submitted undated conclusory declarations to establish the alleged facts that they rely upon for their conditional certification motion. These declarations should be disregarded and stricken because they are unreliable and have been contradicted, and specifically denied, during Plaintiffs' deposition testimony. In fact, Murray testified during his deposition that he had revised his declaration because it contained incorrect factual allegations, but that the original, uncorrected declaration was submitted in support of Plaintiffs' <u>Motion</u>. (Murray Dep. pp. 43-36)

Further, the contents of the undated declarations are repeatedly contradicted by Plaintiffs' deposition testimony. The declarations are all basically the same – word for word. The following are the blatant contradictions:

---

[2] Defendants' filed deposition excerpts of Baker, Everett and Gibson on August 15, 2012 (Doc. No. 57) in support of the opposition without delineating the contradictions between the supporting declarations and the sworn deposition testimony. The excerpts were stricken by the Court on August 16, 2012 (Doc. No. 58).

1.  "In fact, I regularly worked 15 or 16 hour days and normally seven (7) days a week."
    (Murray Decl ¶3)
    a.  Murray testified that he never worked more than six (6) days per week, and that
        his declaration was incorrect.  (Murray Dep, pp. 43-46).

2.  "I followed this schedule, with some variance, 7 days per week."  (Murray Decl ¶3)
    a.  Murray testified that he never worked more than six (6) days per week.  (Murray
        Dep., pp. 43-46).

3.  "I was also not compensated for 'unproductive time' which included but was not limited
    to time waiting on customers to arrive, attend work meetings, and prepare and close for
    the day."  (Murray Decl.¶9, White Decl. ¶9, Baker Decl. ¶8, Gibson Decl. ¶9, Everett
    Decl. ¶9)
    a.  Murray testified that he understood that the amount of his compensation paid by
        IET was to compensate him for travel time, waiting time, performing the
        installation, and post-installation work.  (Murray Dep., pp. 34-35)
    b.  White testified that his compensation was to cover his time with the customer,
        doing the installations, and completing the paperwork.  (White Dep. pp. 146-147)
        He heard a "rumor" about mileage being paid, but it was never a policy of IET.
        *Id.*
    c.  Everett testified that he understood the compensation was to cover the job, but did
        not realize there was going to be so much driving.  (Everett Dep. pp. 19, 69-70)

4.  "I was given this designation by IET even though IET and DISH required us satellite
    technicians to call an IET representative upon arrival to and departure from…"  (¶10 of
    Declarations)
    a.  Murray testified that DISH did not require him to call an IET representative upon
        his arrival to and departure from a customer (Murray Dep, pp. 60, 71)
    b.  White testified he had limited contact with DISH.  (White Dep. pp. 96, 110-111)
    c.  Baker testified that he received no direction from DISH or any requirement that
        he check in.  (Baker Dep. pp. 47, 60-67)
    d.  Everett testified that he had no communications with DISH regarding the work he
        was doing (Everett Dep. pp. 121-125, 143)
    e.  Gibson testified that he did not know if DISH required him to contact the IET
        dispatch when he left a customer. (Gibson Dep. pp. 143-144)

5.  "…IET and DISH required us to purchase all materials and tools through them at IET's
    warehouse which had to be approved by DISH…"  (¶10 of Declarations)
    a.  Murray testified that when he started with IET, he had his own tools, so he was
        not required by either IET or DISH to purchase tools through IET's warehouse.
        (Murray Dep., pp. 49-50, 77)   He also testified he purchased supplies from other
        sources than IET (or DISH) because it was cheaper.  (Murray Dep. p. 67.)
        Murray further testified DISH did not require him to purchase materials or tools
        from IET.  (Murray Dep. p. 68-70.)

b.    White testified he often purchased tools and supplies from IET, but was not required to.  Instead, he purchased supplies from electronics supplies or Lowes. (White Dep. pp. 112-113.).

c.    Baker testified he purchased tools from suppliers other than IET or DISH because they were cheaper.  (Baker, p. 40)  He also testified he never received any instructions from DISH that he needed to use certain tools. (Baker Dep. p. 62)

d.    Everett testified that DISH did not require the purchase of tools or materials from IET.  (Everett Dep. p. 143)

e.    Gibson testified that he was not required to purchase materials and tools from IET, and that he could purchase parts from places other than IET. (Gibson Dep. pp. 96-97, 144)

6.    "…IET and DISH determined our work schedules…"  (¶10 of Declarations)

a.    Murray testified that while he would report to work at 6:00 a.m., he could go home whenever his work was done, whether it was 2:00 p.m., 4:00 p.m. or 9:00 p.m. (Murray Dep., p. 41)  He also testified that DISH did not determine his work schedule.  (Murray Dep., p. 71)

b.    White testified he decided the order in which he performed his installations based upon where the customer lived.  (White Dep., p. 88-89.)  He also testified that he took off work on a few occasion, and still received routes when he returned. (White Dep. pp. 97-100)

c.    Baker testified that he received the schedule from the IET supervisors, but had no idea who made up the schedules. (Baker Dep. p. 69).  He also testified that *he* could schedule days off.  *Id.*

d.    Everett testified that his schedule was set by IET.  (Everett Dep. p. 71-72)

e.    Gibson testified that he had no idea if DISH determined the work schedule at IET. (Gibson Dep. pp. 144-145).

7.    "…IET and DISH provided on-the-job training…"  (¶10 of Declarations)

a.    Murray testified that when he arrived at IET he possessed all the skills necessary to do installations of DISH satellite systems.  (Murray Dep. pp. 50-51)  He also testified that DISH did not provide him with any on-the-job training. (Murray Dep. pp. 70-71.)

b.    White testified he did not receive any on-the-job training from either IET or DISH, as he possessed all the skills necessary to perform satellite installation when he began work at IET.  (White Dep. p. 83)  He further testified that his first couple of days with IET a supervisor watched his installations, for which White was paid.  (White Dep. pp. 149-150)

c.    Baker testified he never received any training or instructions from DISH. (Baker Dep. pp. 60-62.)

d.    Everett testified that he did not go through any training when he went to work for IET (Everett Dep. pp. 91-92)

e.    Gibson testified that DISH never provided him with on-the-job training at IET. (Gibson Dep. p. 145)

8.   "…IET restricted us from working for other cable companies…"   (Murray Decl ¶10, White Decl ¶10, Gibson Decl ¶10)

   a.   Murray testified that he did not have any restrictions from working for other cable companies while employed with IET.  (Murray Dep. p. 51)

   b.   White testified that he quit IET and went to work installing Direct TV, but then returned to IET with no problem.  He also testified that he was not aware of any restrictions on working for other companies/people. (White Dep. pp. 72-74, 83)

   c.   Baker testified that he did not recall signing anything that restricted him from working for other companies.  (Baker Dep. pp. 49)

   d.   Everett testified that he did not sign any restrictive covenants, and in fact, did work for customers and pre-wiring for construction projects.  (Everett Dep. pp. 92-93)

   e.   Gibson testified that DISH never restricted him from working for other install companies, and that he did not sign any agreement with IET restricting him from doing other work.  (Gibson Dep. pp. 86-87, 133, 145)

9.   "…IET and DISH administered financial penalties/'charge backs' for thing…" (¶10 of Declarations)

   a.   Murray testified he had no clue if DISH ever assessed a charge back on him. (Murray Dep. p. 70.)

   b.   White testified he never received any charge backs from DISH. (White Dep. p. 111.)

   c.   Baker testified he did not know where the chargebacks originated, or if they were from DISH. (Baker Dep. p. 62)

   d.   Everett testified that DISH never issued a chargeback. (Everett Dep. p. 122)

   e.   Gibson testified that he had no knowledge of DISH administering chargebacks. (Gibson Dep. p. 145)

10.   "…we were required to perform our work in an order set by IET…"   (¶10 of Declarations)

   a.   Murray testified that in fact he did not have a set schedule.  (Murray Dep. p. 57)

   b.   White testified he decided the order in which he performed his installations based upon where the customer lived.  (White Dep., p. 88-89.)

   c.   Baker testified he would decide the order in which he would perform his installs. (Baker Dep. pp. 52-53.)

   d.   Everett testified that he would decide what order to do the routes based on those assigned for the morning and those for the afternoon.  (Everett Dep. pp. 90-91)

   e.   Gibson testified that when he received his routes in the morning, he would determine which to do first (despite any request for IET or DISH to do certain calls first).  (Gibson Dep. pp. 99-100)

11.   "…IET and DISH provided a list of residences requiring our services…" (Murray Decl. ¶10, Baker Decl. ¶10, Gibson Decl. ¶10)

   a.   Murray testified that IET gave him the list of customers. (Murray Dep. pp. 57-58) He also testified that DISH did not give him a list of customers.  (Murray Dep. p. 71)

    b.    Baker testified that he had no contact with DISH except he *heard* a DISH representative went to one customer's home after he did an installation.  (Baker Dep. p. 47, 60-67)

    c.    Everett testified that he received the list only from IET. (Everett Dep. pp. 143-144)

    d.    Gibson testified that he had no knowledge of where the customer list requiring service came from.  (Gibson Dep. p. 145)

12.    "…we drove in trucks with the name 'DISH Network' placed on them…" (¶10 of Declarations)

    a.    Murray testified that he never had a DISH placard on his vehicle.  (Murray Dep., p. 59

13.    "…DISH determined which jobs we would do in the morning and in the afternoon…" (¶10 of Declarations)

    a.    Murray testified that he received his routes from IET, and that DISH did not determine his work schedule. (Murray Dep. pp. 58, 68-71.)

    b.    White decided the order in which he performed his installations based upon where the customer lived, and that he changed routes with other installers.  (White Dep., pp. 88-89, 91-92.)

    c.    Baker testified he would decide the order in which he would perform his installs. (Baker Dep. pp. 52-53.)

    d.    Everett testified that he set the order of his installations.  (Everett Dep. pp. 71-73, 96)

    e.    Gibson testified that he had no knowledge of DISH having any role in which jobs were morning jobs and which jobs were afternoon jobs. (Gibson Dep. p. 145)

14.    "…IET specified the order of completion for the morning jobs and the order of completion for the afternoon jobs…"  (¶10 of Declarations)

    a.    Murray testified that he could start his afternoon jobs in the morning. (Murray Dep. pp. 71, 75-76)

    b.    White testified he decided the order in which he performed his installations based upon where the customer lived, and that he often changed routes with other installer.  (White Dep., pp. 88-89, 91-92)

    c.    Baker testified he would decide the order in which he would perform his installs. (Baker Dep. pp. 52-53, 76-77)

    d.    Everett testified that he set the order of his installations.  (Everett Dep. pp. 71-73, 96)

    e.    Gibson testified that he had no knowledge of DISH having any role in which jobs were morning jobs and which jobs were afternoon jobs. (Gibson Dep. p. 145)

15.    "…IET and DISH maintained communication with us throughout the day…" (¶10 of Declarations)

    a.    Murray testified that he *never* spoke to a DISH representative, nor received any direction from someone with DISH.  (Murray Dep. 67-70)

b. White testified that he rarely spoke to a DISH representative, except (1) to its automated system to activate the satellite equipment, (2) to a DISH technician to troubleshoot a problem activating the satellite, and (3) twice, to a DISH representative who spoke to a customer and looked at the installation, but gave no instructions or directions.  (White Dep. pp. 96, 110-111)

c. Baker, testified that he *never* spoke to DISH, except to its automated system to activate the satellite equipment or to a DISH technician to troubleshoot a problem activating the satellite.  (Baker Dep. 61)

d. Everett testified that other than for connectivity or troubleshooting the uplink to the satellite, he did not have any other communications with a DISH representative during the day. (Everett Dep. pp. 122, 143-144)

e. Gibson testified that DISH did not require any communications from him during his work for IET, and, in fact, he only communicated with IET.  (Gibson Dep. p. 145)

f. Baker, Murray, White, Everett and Gibson all testified that they *never* received any direction from DISH.  (Baker Dep. pp. 60-67; Murray Dep. pp. 67-71; White Dep. p. 96; Everett Dep. pp. 121-125, 143-144; Gibson Dep. pp. 144-145)

16. "In fact, I can think of no difference between satellite technicians classified as either contractors or employees."  (¶13 of Declarations)

a. Murray testified that IET employees received a company vehicle, had company vehicle paid insurance, were given tools, received gasoline from the company, etc. (Murray Dep. pp. 72-73)  In fact, Murray testified that he chose to become an independent contractor because the pay scale was different.  (Murray Dep., p. 50).

b. White testified he could have been paid by the hour as an employee or by the task as an independent contractor, which he chose the latter because he had his own truck and could make more money depending upon the route.  (White Dep. pp. 79-80)

c. Baker testified that as an employee for IET, he received a company vehicle, insurance coverage on the vehicle, supplies, tools, and uniforms.  (Baker Dep., pp. 47-48)

d. Everett testified he understood employees were covered by workers' compensation. (Everett Dep. pp. 79)

17. "I know of other employees of IET who would join this lawsuit if it is treated as a collective action."  (¶15 of Declarations)

a. Murray testified that the only other individual he knew who was interested in the lawsuit was Dale White, who is already a named plaintiff.  (Murray Dep. p. 90)

b. White testified he only knew of five (5) interested in joining the lawsuit: Ban Murray (already a plaintiff), Larry (last name unknown), Miller (first name unknown and likely James Miller, a dismissed plaintiff), and Charles (last name unknown and likely Charles Mullins, a named plaintiff).  (White Dep. pp. 123-124).

c. Baker testified he is only aware of Joe Everett, already a plaintiff, that is interested in joining this lawsuit. (Baker p. 93.)

     d.     Everett testified that he spoke to several former individuals who worked for IET, but only three (3), John Neal, Lee Danzy and Ronald Hayes indicated they were interested in joining the lawsuit.  (Everett Dep. pp. 144-149)

In fact, Baker, Murray, White, Everett and Gibson all testified that DISH had **no role whatsoever** in their hiring, pay, reimbursement, charge backs, hours, routes, or the materials/supplies used – directly contrary and in complete contradiction to their Declarations submitted in support of the <u>Motion to Conditionally Certify the Class</u>.  (Murray Dep. 67-71; White Dep. 83; Baker Dep.  47, 60-67; Everett Dep. 121-125, 143; Gibson Dep. 144-145)

                           Respectfully submitted,

                              _____/s/ Josh C. Harrison_____
                              **ERNEST R. MALONE, JR.** (#09066)
                              **JOSH C. HARRISON** (#33574)
                              **THE KULLMAN FIRM, P.L.C.**
                              1100 Poydras Street, Suite 1600
                              New Orleans, LA  70163
                              Telephone:  (504) 524-4162
                              Facsimile:  (504) 596-4189
                              E-Mail:  erm@kullmanlaw.com
                              E-Mail:  jch@kullmanlaw.com

                              **ERIC R. MILLER** (#21359)
                              **THE KULLMAN FIRM, P.L.C.**
                              4605 Bluebonnet Blvd., Suite A
                              Baton Rouge, Louisiana, 70809
                              Telephone (225) 906-4250
                              Facsimile (225) 906-4230
                              E-Mail:  em@kullmanlaw.com

                              **COUNSEL FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of September, 2012, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system and served upon the following counsel of record accepting e-noticing:

J. Douglas Sunseri (jdsunseri@nslawla.com)
Svetlana V. Crouch (scrouch@snlawla.com)
Jesse B. Hearin, III (jbhearin@hearinllc.com)
Galvin B. Kennedy (gkennedy@kennedyhodges.com)

_____/s/ Josh C. Harrison_____
**Josh C. Harrison**